# UNITED STATES DISTRICT COURT

## DISTRICT OF SOUTH DAKOTA

### CENTRAL DIVISION



| | |
|---|---|
| UNITED STATES OF AMERICA, | 3:14-CR-30138-RAL |
| Plaintiff, | REPORT AND RECOMMENDATION FOR DISPOSITION OF MOTIONS TO SUPPRESS EVIDENCE AND FOR DRUG DOG PERFORMANCE AND CERTIFICATION RECORDS |
| vs. | |
| BRANDON JERAYE TREJO, | |
| Defendant. | |

## SUMMARY

A vehicle was stopped for speeding on a South Dakota highway. The occupants, one of whom was Brandon Trejo, were detained while a trooper ran record checks and made inquiries. Following successive alerts and indications from a drug dog, the vehicle was searched and large amounts of cash and methamphetamine were found inside. Trejo seeks to suppress this evidence on Fourth Amendment grounds and to have the dog's drug detection records produced. Because as a passenger he only has standing to challenge the legality of his detention – not the vehicle search – and because federal law does not call for the exclusion of the seized evidence or for the disclosure of the canine records under the circumstances present, the Court recommends that his suppression and production motions be denied.

## BACKGROUND

At approximately 7:14 p.m. on November 14, 2014, Brian Biehl, a trooper with the State Highway Patrol, observed a 2002 GMC Denali with Colorado license plates traveling westbound on U.S. Highway 18 approximately ten miles west of Winner, South Dakota. Using his radar, the trooper determined that the vehicle was traveling three miles over the posted speed limit and stopped it.

Trooper Biehl approached the Denali and saw there were five occupants, three adults, a child and an infant. The driver, who was later identified as Abraham Garsia, did not have a driver's license or any identification and stated he was driving because his wife was taking care of the infant.

Garsia was asked to come back to the patrol car and he complied. There, Trooper Biehl attempted to check on Garsia's driver's license status. While doing so, the trooper inquired about where the occupants had traveled from, what they had done, where Garsia lived and what he did for a living. Garsia said they had gone to Minnesota to see friends and their new house, they had been gone for a week and they were headed back to Denver, where he lived and owned a barbershop.

Trooper Biehl went over to the Denali to check on the occupants and to see if the remaining two adults had valid driver's licenses. Trejo was situated in the front passenger seat. Jennifer Hernandez, Garsia's wife and the registered owner of the

2

vehicle, was in the middle row.  Next to her was an infant child.  Seated in the far rear row was a young boy, approximately eight or nine years old.

Trejo and Hernandez both had driver's licenses.  Trooper Biehl asked them about their trip, where they went, who they stayed with and how long they were gone.  Their responses were inconsistent with what Garsia had earlier told the trooper.

Back in the patrol car, Trooper Biehl ran computer queries on Trejo and Hernandez and spoke more with Garsia about the trip, his Minnesota friends, their new house and what Trejo did for work.  Garsia continued to provide conflicting information.

Trooper Biehl went back to the Denali, returned the driver's licenses to Trejo and Hernandez and talked to them again.  The information they gave him did not ring true with what Garsia had disclosed.

Rejoining Garsia in the patrol car, Trooper Biehl probed further, about what Garsia had previously told him, and received more variant answers.  As he watched and listened, the trooper could see Garsia's carotid artery and heart thumping in both his neck and chest.

Given the divergent information provided, Garsia's extreme nervousness and the fact that his name could not be found in multiple record checks, Trooper Biehl informed Garsia he was a drug dog handler and canvassed Garsia about whether there was any chance his dog would indicate to the odor of drugs coming from the Denali.  Garsia responded in the negative.  The trooper then asked if there was any marijuana,

3

paraphernalia, methamphetamine or cocaine in the vehicle. Garsia replied there was not. The trooper also inquired if Garsia had a large amount of money in the vehicle. Garsia said yes and disclosed that Hernandez had about $5,000 in her wallet they brought for the trip.

Trooper Biehl walked over to the Denali again and proceeded to question Hernandez about how much currency she had in her purse. Hernandez looked in her wallet and said there was $2,000, but Biehl could tell that the actual amount was substantially more than this.

Upon returning to the patrol car, Trooper Biehl asked Garsia if he would consent to a search of the Denali. Garsia refused, saying a warrant was needed from a judge. In response, the trooper went through the mismatched stories Garsia, Trejo and Hernandez had told him and announced he was going to run his dog around the vehicle.

A minute or so later, Trooper Biehl deployed his drug dog, Zara. The dog almost immediately alerted to the odor of illegal drugs as she passed the rear doors of the Denali, increasing her breathing and making head checks. She also indicated twice to the vehicle's rear passenger door seam by sitting and staring at it.

Once he had placed Zara back into the patrol car, Trooper Biehl sat down in the driver's seat and confronted Garsia about there being drugs and additional cash in the Denali, Garsia's identity (based on the lack of any record of his existence in the system), why Trejo came on the trip, what Trejo's occupation was and where he worked. After

4

yet another failed attempt to find his name in any database, Garsia divulged that his last name had a different spelling than the one he had told the trooper three times before.

At 7:55 p.m., about 40 minutes after the stop, a deputy sheriff arrived at the scene to assist. Trejo, Hernandez and the two children were all placed in the deputy's patrol car. Without any break in time, Trooper Biehl began searching the Denali. In it he found almost $12,000 in Hernandez's purse and a one-pound package of methamphetamine in a duffel bag with several documents bearing Trejo's name. Afterward, Trejo was handcuffed, placed under arrest for possession of a controlled substance and advised of his *Miranda* rights. He was later taken to Winner and jailed there.

On December 9, 2014, Trejo was charged, by federal indictment, with a single count of possession with intent to distribute a controlled substance. The indictment also sought to forfeit another $3,100 in cash that had been seized from a diaper found during a post-arrest search of the Denali at the Winner state shop. He subsequently filed motions to suppress from use at trial the currency and narcotics taken from the vehicle and to produce Zara's performance and certification records. The Government responded in writing to the motions, resisting the same.

On April 15, 2015, an evidentiary hearing was held at which Trooper Biehl testified and eight exhibits were received into evidence. The Court now submits this

report and recommendation for disposition of Trejo's suppression and production motions.

## DISCUSSION

Trejo seeks to suppress the cash and drugs seized from the Denali. He says that he was illegally detained pending Zara's deployment and that probable cause to search the vehicle was lacking because her alerts and indications (or "hits" as he calls them) were unreliable. He also wants complete copies of the dog's performance records both in the field and in standard training and certification settings.

### A. Standing

The Government argues that Trejo, as a passenger, has no standing to complain about the search conducted and the evidence seized from Hernandez's Denali. The Court agrees with this argument, but only in part.

To contest the validity of a search, a person must have a reasonable expectation of privacy in the place searched.[1] "Fourth Amendment rights are personal and may not be vicariously asserted."[2] In moving to suppress the contraband removed from the Denali, Trejo has the burden of proving that he personally has an expectation of privacy

---

[1] *See Katz v. United States,* 389 U.S. 347, 351-52 (1967).

[2] *See Rawlings v. Kentucky,* 448 U.S. 98, 104-08 (1980); *Rakas v. Illinois,* 439 U.S. 128, 133-38 (1978); *United States v. Crippen,* 627 F.3d 1056, 1063 (8th Cir. 2010) (citing *United States v. Barragan,* 379 F.3d 524, 529 (8th Cir. 2004)), *cert. denied,* 131 S.Ct. 2914 (2011); *United States v. Washington,* 197 F.3d 1214, 1216 (8th Cir. 1999) (citing *Alderman v. United States,* 394 U.S. 165, 174 (1969)), *cert. denied,* 531 U.S. 1015 (2000).

in the vehicle and that this expectation is objectively reasonable.[3]  As a mere passenger, with no possessory or ownership interest in the vehicle, he cannot carry his burden. This is because he has no legitimate expectation of privacy in the interior of the vehicle and no right to exclude others from it.[4]  Trejo thus has no standing to contest the search of the vehicle.[5]

The United States Supreme Court's decision in *Brendlin v. California*,[6] cited by Trejo, is not to the contrary.  *Brendlin* addressed a passenger's standing to challenge the constitutionality of the initial traffic stop, not the search of the vehicle in which he was riding.[7]

The Eighth Circuit Court of Appeals has made it clear that a person who is a passenger in a vehicle he does not own has no expectation of privacy to contest the search of the vehicle and any of his "effects" found inside.[8]  The Appeals Court's

---

[3]*See Rakas*, 439 U.S. at 143-44 & n.12; *Barragan*, 379 F.3d at 529; *United States v. Green*, 275 F.3d 694, 699 (8th Cir. 2001); *United States v. Muhammad*, 58 F.3d 353, 355 (8th Cir. 1995).

[4]*See Rakas*, 439 U.S. at 148-49; *Crippen*, 627 F.3d at 1063; *United States v. Salgado*, CR 12-30099-RAL, 2013 WL 1348264 at *3 (D.S.D. April 1, 2013).

[5]*See Salgado*, 2013 WL 1348264 at *3.

[6]551 U.S. 249 (2007).

[7]*See* 551 U.S. at 254, 256-58.

[8]*See Crippen*, 627 F.3d at 1063; *United States v. Spotted Elk*, 548 F.3d 641, 657 (8th Cir. 2008), *cert. denied*, 556 U.S. 1145 (2009); *Barragan*, 379 F.3d at 530; *Green*, 275 F.3d at 699.

decisions are formidable evidence of an unwillingness, on the part of the Court, to accept the argument that *Brendlin* overruled, *sub silentio,* nearly 40 years of Fourth Amendment jurisprudence and restored a passenger's right to challenge the search of a vehicle he has no legitimate expectation of privacy in/or to.[9]

This view appears to be in accord with a majority of the courts that have considered the issue. These courts have concluded that *Brendlin* did not modify earlier Supreme Court precedent relating to a passenger's standing to contest the search of another's vehicle.[10]

Because Trejo does not have standing to contest the search of the Denali, he is not entitled to (1) receive Zara's real-world training and certification records and (2) attack the probable cause for the search based on the dog's unreliability.[11] Even so, Trejo may

---

[9]*See e.g. United States v. Guzman,* 454 Fed. Appx. 531, 534 (8th Cir. 2012) (because the passenger is attempting to challenge the search of the vehicle, not the traffic stop, *Brendlin* provides him no support); *Crippen,* 627 F.3d at 1063 (holding that *Brendlin* only gives a vehicle passenger the right to challenge the traffic stop, not the search of the vehicle itself); *Spotted Elk,* 548 F.3d at 657 (rejecting the argument that *Brendlin* stands "for the proposition that a person who is a passenger in the past retains standing to challenge future searches of someone else's car").

[10]*See e.g. United States v. Valdez,* 540 Fed. Appx. 363, 364 (5th Cir. 2013); *United States v. Symonevich,* 688 F.3d 12, 19-20 (1st Cir. 2012); *United States v. Valle-Irizary,* Crim. Action No. 14-00103, 2014 WL 3673139 at **4-5 (D.N.J. July 22, 2014); *Hollins v. Timmerman-Cooper,* No. 3:12-CR-1423, 2013 WL 1908309 at *9 (N.D. Ohio April 4, 2013), *report and recommendation adopted,* 2013 WL 1908345 (N.D. Ohio May 5, 2013); *see also United States v. Villaverde-Leyva,* No. 1:10-CR-035-RWS/AJB, 2010 WL 5579825 at *15 (N.D. Ga. Dec. 9, 2010) (collecting cases), *report and recommendation adopted,* 2011 WL 121932 (N.D. Ga. Jan. 14, 2011).

[11]*See Salgado,* 2013 WL 1348264 at *3.

8

still contest the lawfulness of his own detention and seek to suppress evidence obtained as a poisonous fruit thereof.[12]

## B. Detention

Trejo claims that he was inexcusably detained, for a prolonged period of time, to permit a canine sniff. In his mind, there were no valid grounds to detain him and deploy Zara. The money and narcotics discovered in the vehicle were, he says, the "fruits" of his illegal detention and must be suppressed. The Court is not persuaded.

The Fourth Amendment protects "persons . . . against unreasonable searches and seizures."[13] The "touchstone of [this] Amendment is 'reasonableness,'"[14] a word "measured in objective terms by examining the totality of the circumstances."[15] Although a traffic stop "constitutes a 'seizure' of 'persons' within the meaning of [the Amendment]," such a seizure is constitutionally "reasonable where the police have

---

[12] See Green, 275 F.3d at 669; United States v. Kreisel, 210 F.3d 868, 869 (8th Cir.), cert. denied, 531 U.S. 916 (2000); Salgado, 2013 WL 1348264 at *2; see also Michigan Dept. of State Police v. Sitz, 496 U.S. 444, 450 (1990) (a passenger has standing to challenge his detention because all occupants of a stopped vehicle are subject to a Fourth Amendment seizure); Salgado, 2013 WL 1348264 at **3, 6 (ruling on the merits of whether a passenger was held too long before a drug dog was deployed and indicated to the odor of drugs coming from the vehicle he was an occupant of).

[13] U.S. Const. amend IV.

[14] Brigham City v. Stuart, 547 U.S. 398, 403 (2006).

[15] Ohio v. Robinette, 519 U.S. 33, 39 (1996).

probable cause to believe that a traffic violation has occurred."[16]   But a seizure can become unlawful if it is prolonged beyond the time reasonably required to complete the tasks tied to the violation that warranted the stop.[17]   "Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the] stop,'"[18] such as checking the driver's license, the registration and proof of insurance for the vehicle and ascertaining whether there are any outstanding warrants against the driver or passengers.[19]   And the officer may ask the occupants questions during, and unrelated to, the stop[20] and quiz passengers to verify information provided by the driver.[21]

---

[16]*Whren v. United States*, 517 U.S. 806, 809-10 (1996).

[17]*See Rodriguez v. United States*, No. 13-9972, 2015 WL 1780927 at **3, 5 (U.S. April 21, 2015).

[18]*Id.* at *6 (*quoting Illinois v. Caballes*, 543 U.S. 405, 408 (2005)).

[19]*See id.; Delaware v. Prouse*, 440 U.S. 648, 658-60 (1979); *see generally* 4 Wayne R. LaFave, *Search and Seizure*, §9.3(c), pp. 507-17 (5th ed. 2012 and 2014-15 Supp.).

[20]*See Arizona v. Johnson*, 555 U.S. 323, 333 (2009); *Muehler v. Mena*, 544 U.S. 93, 100-01 (2005); *Maryland v. Wilson*, 519 U.S. 408, 414-15 (1997); *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977) (*per curiam*); *see also United States v. Salgado*, 761 F.3d 861, 865 (8th Cir. 2014) (asking where the men were going, where they had come from and other general questions, not directly related to the traffic violation, did not effect an unreasonable seizure); *United States v. Olivera-Mendez*, 484 F.3d 505, 510-11 (8th Cir. 2007) (asking off-topic questions during an otherwise lawful traffic stop does not constitute a discrete Fourth Amendment event); *see generally* 4 *Search and Seizure*, §9.3(d), pp. 526-36.

[21]*See United States v. Foley*, 206 F.3d 802, 805 (8th Cir. 2000); *United States v. Johnson*, 58 F.3d 356, 357 (8th Cir.), *cert. denied*, 516 U.S. 936 (1995).

A dog sniff though is aimed at "detect[ing] evidence of [ ] criminal wrongdoing,"[22] and is not a general incident of a traffic stop.[23]  A sniff thus cannot be fairly characterized as a part of the officer's traffic mission.[24]  Absent reasonable suspicion, an officer's extension of the stop, in order to conduct a dog sniff, violates the Constitution's proscription against unreasonable seizures.[25]  The officer must make and finish up his traffic-based inquiries in "the amount of 'time reasonably required to complete [the stop's] mission."[26]  A "stop 'prolonged beyond' that point is 'unlawful.'"[27]  The critical question is whether conducting the dog sniff extends – or adds time to – the stop.[28]

Even if it does, lengthening a traffic stop to allow for a sniff of a vehicle may be independently justified by an officer's reasonable suspicion that criminal activity, unrelated to the stop, is afoot.[29]  Reasonable suspicion requires "a particularized and

---

[22]*Indianapolis v. Edmond,* 531 U.S. 32, 40-41 (2000).

[23]*See Rodriguez,* 2015 WL 1780927 at *6.

[24]*See id.*

[25]*See id.* at *5

[26]*Id.* at *7 (*quoting Caballes,* 543 U.S. at 407).

[27]*Id.*

[28]*See id.*  at *7.

[29]*See Salgado,* 761 F.3d at 866; *United States v. Chavez Loya,* 528 F.3d 546, 553 (8th Cir. 2008); *United States v. Lyons,* 486 F.3d 367, 371-72 (8th Cir. 2007); *United States v. Donnelly,* 475 F.3d 946, 951-53 (8th Cir.), *cert. denied,* 551 U.S. 1123 (2007).

objective basis for suspecting legal wrongdoing" and the wrongdoing need not rise to the level necessary to establish probable cause.[30]

Here, Trooper Biehl completed all of his traffic-based inquiries of Trejo by 7:27 p.m. The trooper had checked and confirmed Trejo had a valid driver's license and no outstanding warrants and had returned Trejo's license to him. So was it unreasonable to detain Trejo another 10 minutes until Zara was deployed? Under the Eighth Circuit's *de minimis* intrusion rule, it may not have been.[31] After the Supreme Court's decision in *Rodriguez*, however, this rule can no longer be relied on to permit a dog sniff conducted after the completion of a traffic stop.[32] That said, the question remains whether the trooper's proffered suspicions that Trejo was engaged in criminal activity were

---

[30]*See United States v. Arvizu*, 534 U.S. 266, 273-74 (2002); *see also United States v. Long*, 532 F.3d 791, 795 (8th Cir. 2008) (reasonable suspicion requires more than an inchoate and generalized hunch, but less than probable cause needed for an arrest); *Donnelly*, 435 at 952 ("officer need only 'articulate some minimal, objective justification for an investigatory stop' in order to comply with the Fourth Amendment") (*quoting United States v. Fuse*, 391 F.3d 924, 929 (8th Cir. 2004).

[31]*See United States v. Rodriguez*, 741 F.3d 905, 907-08 (8th Cir.), *cert. granted*, 135 S.Ct. 43 (2014), *vacated and remanded*, 2015 WL 1780927 (U.S. April 21, 2015); *United States v. Coleman*, 700 F.3d 329, 335-36 (8th Cir. 2012), *cert. denied*, 133 S.Ct. 2369 (2013); *United States v. Bowman*, 660 F.3d 338, 343-44 (8th Cir. 2011); *United States v. Norwood*, 377 Fed. Appx. 580, 583 (8th Cir. 2010), *cert. denied*, 131 S.Ct. 996 (2011); *United States v. Mohamed*, 600 F.3d 1000, 1005 (8th Cir. 2010); *United States v. Rivera*, 570 F.3d 1009, 1012-15 (8th Cir. 2009); *United States v. Alexander*, 448 F.3d 1014, 1016 (8th Cir. 2006), *cert. denied*, 549 U.S. 1118 (2007).

[32]*See Rodriguez*, 2015 WL 1780927 at **6-7.

reasonable and provided a legitimate basis for Trejo's continued detention – a question *Rodriguez* left open for consideration on remand.[33]

But was Trejo actually detained during the 23 minutes or so before Zara's deployment and indications? After all, he sat in the Denali with Hernandez and the two children and was not restrained or directed to stay put and presumably could have gotten out of the vehicle and started walking down the road. As a practical matter though, the traffic stop communicated to him that he was not fee to terminate the encounter with Trooper Biehl and move about at will.[34] He was thus seized "from the moment [the vehicle came] to a halt on the side of the road."[35] And his seizure continued up to, and past, the dog's sniff.[36] Nothing occurred before the sniff "that would have conveyed to [Trejo] that the [ ] stop had ended or that he was otherwise free to depart without [the trooper's] permission."[37]

Still, Trejo's extended detention was not unreasonable – and thus did not infringe on Fourth Amendment strictures – because Zara's sniff was independently supported

---

[33]*See id.* at *7.

[34]*See Johnson*, 555 U.S. at 333; *Brendlin*, 551 U.S. at 256-57; *see also Wilson*, 519 U.S. at 413-14 (indicating that, "as a practical matter," all of the occupants of a vehicle are detained during a traffic stop).

[35]*Brendlin*, 551 U.S. at 263; *see also Johnson*, 555 U.S. at 332.

[36]*See Johnson*, 555 U.S. at 333; *Brendlin*, 551 U.S. at 258-62.

[37]*Johnson*, 555 U.S. at 333-34 (*quoting Brendlin*, 551 U.S. at 257).

13

by "a particularized and objective basis for suspecting" that he, Garsia and Hernandez were all collectively involved in illegal drug activity.[38]  Indeed, when looking at "the whole picture,"[39] the suspicions Trooper Biehl had were enough to detain Trejo for investigative purposes.

Trejo had traveled from Colorado, a "source state" for drugs, to Minneapolis, a drug destination city, and was now returning to that state.[40]  The road he was on (U.S. Highway 18) is one known for transporting large amounts of marijuana, methamphetamine and drug proceeds.  Significantly, the two adults he was with (Garsia and Hernandez) had a large sum of cash with them.

Garsia, the driver, had no driver's license or ID card.  Several times, he gave Trooper Biehl an incorrect spelling of his last name (Garsea instead of Garsia), causing

---

[38]*Navarette v. California*, 134 S.Ct. 1683, 1687 (2014); *United States v. Cortez*, 449 U.S. 411, 417-18 (1981).

[39]*Id.; see also Ornelas v. United States*, 517 U.S. 690, 695 (1996) (reasonable suspicion is determined by taking into account "the factual and practical considerations of everyday life on which reasonable and prudent men, not technicians, act").

[40]*See United States v. Gallardo*, 495 F.3d 982, 987 (8th Cir. 2007) (travel from California, a "regular source of illegal narcotics in the Midwest," to Sioux City, "a known destination for narcotics traffickers," enough to raise suspicion of drug activity); *United States v. Carpenter*, 462 F.3d 981, 982 (8th Cir. 2006) (travel from Austin, Texas to New York sufficient to heighten suspicion that driver was carrying drugs), *cert. denied*, 549 U.S. 1343 (2007); *United States v. White*, 42 F.3d 457, 460 (8th Cir. 1996) (reasonable suspicion supported by fact that defendant traveling from El Paso, Texas, a known source city for drugs).

delays in the making of fruitful record checks on him.[41]  And he appeared unusually nervous.  His carotid artery and heart throbbed noticeably even after being told he would be getting a warning ticket for the speeding infraction.  He also insisted there were no drugs or additional cash in the vehicle, but refused to consent to a search of the same.

Most importantly, Garsia, Trejo and Hernandez provided information that was, in many respects, inconsistent and not credible.  According to Garsia, he and Hernandez went to Minnesota to visit friends at their new home while Trejo spent time with his own friends there.  In contrast, Trejo and Hernandez said they did not know anyone in Minnesota and Trejo indicated he was with Garsia and Hernandez the whole time.  Garsia maintained he owned a barbershop in Denver and had five employees running the shop while he was gone.  But Hernandez stated Garsia had sold the shop years earlier and now worked for someone.  Garsia thought Trejo was a laborer for a painting company.  Trejo, instead, reported being employed at a body shop for two years.  Garsia believed Hernandez had about $5,000 cash in her wallet.  Hernandez

---

[41]See United States v. Suitt, 569 F.3d 867, 871 (8th Cir.) ("when there are complications in carrying out the traffic-related purposes of the stop, for example, police may reasonably detain a driver for a longer duration than when a stop is strictly routine") (quoting Olivera-Mendez, 484 F.3d at 510), cert. denied, 558 U.S. 1003 (2009); United States v. Peralez, 526 F.3d 1115, 1119 (8th Cir. 2008) (if complications arise during a routine traffic stop, the detention of a vehicle may reasonably be extended).

contended the amount was only $2,000, yet Trooper Biehl could see she had far more money than that.

These facts, taken together, easily meet the standard for reasonable suspicion. "[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion"[42] inconsistent stories and itineraries, unknown/false identifications and travel in a recognized drug trafficking corridor are also factors in the suspicion calculus.[43] "[C]ommon sense judgments and inferences about human behavior"

---

[42]*Illinois v. Wardlow*, 528 U.S. 119, 124 (2000).

[43]*See Salgado*, 761 F.3d at 866 (inability to match/find the name given in database and "false identification"); *United States v. Riley*, 684 F.3d 758, 764 (8th Cir.) ("undue nervousness" and "vague or conflicting answers to simple questions about [ ] itinerary"), *cert. denied*, 133 S.Ct. 800 (2012); *United States v. Briasco*, 640 F.3d 857, 859 (8th Cir. 2011); ("increasing nervousness shown by . . . visible carotid artery" and "imprecise description" of travel plans); *Bowman*, 660 F.3d at 345 (suspects "palpably nervous" and their stories were "inconsistent"); *United States v. Bracamontes*, 614 F.3d 813, 816 (8th Cir. 2010) ("conflicting stories" that were "internally contradictory and contradicted [ ] wife's account of their journey"); *Mohamed*, 600 F.3d at 1002, 1005-06 (skeptical explanation for being on the road, heavier and deeper breathing than is typical and an elevated level of nervousness); *Lyons*, 486 F.3d at 372 ("unusual itinerary" and "contradictory descriptions of the friends *** just visited"); *United States v. Sanchez*, 417 F.3d 971, 975 (8th Cir. 2005) ("increasingly nervous behavior," failed attempts after running a "questionable ID" and "conflicting stories"); *Fuse*, 391 F.3d at 929 ("traveling from a 'source state' for illegal narcotics", the "unusual explanation" for traveling to a certain destination and the "continued, unusual nervousness" even after the trooper indicated he was only issuing a warning citation), *cert. denied*, 544 U.S. 990 (2005); *see also United States v. Pack*, 612 F.3d 341, 358-62 (5th Cir.) (extreme nervousness, conflicting stories and travel along a drug trafficking corridor sufficient to trooper to suspect that driver and passenger were engaged in criminal drug activity), *cert. denied*, 131 S.Ct. 620 (2010); *State v. Deviley*, 2011 ND 182, ¶12, 803 N.W.2d 561, 566 (2011) ("unusually nervous behavior" and "inconsistent stories" regarding travel arrangements and destination); *State v. Littlebrave*, 2009 S.D. 104, ¶19, 775 N.W.2d 85, 92

(continued...)

16

support Trooper Biehl's belief that Garsia, Trejo and Hernandez were involved in drug trafficking.[44]

Granted, there may be innocent explanations for Trooper Biehl's suspicions. But acts that, by themselves, may be innocent can, when taken together, give rise to reasonable suspicion.[45]   *Terry v. Ohio*[46] is one example.   *Terry* involved two men repeatedly walking back and forth, looking into a store window, and conferring with one another as well as with a third man.[47]  All of this conduct was itself lawful, but also suggested that the men were casing the store in preparation for a robbery.   The Supreme Court observed that this "series of acts," each of them perhaps innocent in itself . . . together warranted further investigation."[48]  This case is no different.

Taking into account all of the relevant facts, Trooper Biehl possessed reasonable suspicion of illegal drug activity to conduct a dog sniff of the Denali.  Hence, Trejo's

---

("inconsistent stories about the [ ] details of the trip"); *Flood v. State,* 2007 WY 167, ¶¶25-30, 169 P.3d 538, 546-47 ("extreme nervousness," discrepancy in story and reported reason for travel implausible).

[44]*Wardlow,* 528 U.S. at 125.

[45]*See Arvizu,* 534 U.S. at 274-75.

[46]392 U.S. 1 (1968).

[47]392 U.S. at 5-6.

[48]*Id.* at 22; *see also Arvizu,* 534 U.S. at 277 (recognizing and applying this same analysis); *Wardlow,* 528 U.S. at 125-26 (same); *United States v. Sokolow,* 490 U.S. 1, 9-10 (1989) (same).

detention, before the sniff occurred, was not unconstitutionally prolonged so as to require the suppression of the money and drugs later discovered in the vehicle.

## CONCLUSION

Trejo has no standing to make a Fourth Amendment challenge to the search of the Denali. He was simply a passenger and had no expectation of privacy in it. Because he lacked standing to contest the vehicle search, he may not obtain copies of Zara's field, training and certification records or challenge the dog's reliability and the probable cause – based on her indications – for the search.

Although detained for some time after the completion of his traffic stop, Trejo's detention was independently warranted by reasonable suspicion of criminal (drug related) activity. Numerous factors, when taken together, provided the suspicion necessary to extend the time needed to handle the matter for which the stop was made. Suppression of the cash and methamphetamine therefore, whether under the Fourth Amendment or the exclusionary rule, is not warranted in this case.

## RECOMMENDATION

Accordingly, it is hereby

RECOMMENDED that Trejo's Motions to Suppress and for Drug Dog Certification and Performance Records[49] be denied.

---

[49]*See* Docket No. 30.

## NOTICE

By mutual consent, the parties have agreed to shorten the period for filing written objections to this report and recommendation from 14 to 7 calendar days.[50] Unless an extension of time for cause is obtained,[51] failure to file timely objections will result in the waiver of the right to appeal questions of fact.[52]  Objections must "identify[] those issues on which further review is desired[.]"[53]

DATED this 4ᵗʰ day of May, 2015.

BY THE COURT:

MARK A. MORENO
UNITED STATES MAGISTRATE JUDGE

---

[50] *See* 28 U.S.C. §636(b)(1) (providing for a 14-day objection period for a motion to suppress evidence in a criminal case); *see also* Fed. R. Civ. P. 72(b) (same for dispositive motions).

[51]*See Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990); *Nash v. Black*, 781 F.2d 665, 667 & n.3 (8th Cir. 1986) (*citing Thomas v. Arn*, 474 U.S. 140, 155 (1985)).

[52]*See Thompson*, 897 F.2d at 357; *Nash*, 781 at 667.

[53]*Arn*, 474 U.S. at 155.