**FILED**

UNITED STATES DISTRICT COURT

**JUL 1 5 2015**

DISTRICT OF SOUTH DAKOTA


CLERK

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | 3:14-CR-30138-RAL |
| Plaintiff, | |
| | OPINION AND ORDER |
| vs. | ADOPTING IN PART |
| | REPORT AND RECOMMENDATION |
| BRANDON JERAYE TREJO, | |
| Defendant. | |

A highway patrol trooper stopped a vehicle for speeding and found methamphetamine in a duffel bag located therein. Defendant Brandon Trejo, a passenger in the vehicle, was arrested and charged with possession with intent to distribute a controlled substance. Trejo moved to suppress the methamphetamine, alleging violations of the Fourth Amendment. The magistrate judge recommended denying Trejo's motion to suppress and Trejo has now filed objections to that recommendation. For the reasons explained below, this Court adopts the Report and Recommendation in part but remands certain issues to the magistrate judge for a hearing.

**I.    Facts**

On November 14, 2014, at approximately 7:14 p.m., Trooper Brian Biehl of the South Dakota Highway Patrol stopped a GMC Denali with Colorado license plates for speeding on U.S. Highway 18. T. 20–21, 56–57; Ex. 1 at 7:14:00. There were five occupants in the Denali: Abraham Garsia, the driver; Trejo, the front-seat passenger; Jennifer Hernandez and an infant child, the middle-row passengers; and a young boy, the far rear-row passenger. T. 23–24.

1

Trooper Biehl approached the vehicle and asked Garsia for his driver's license. T. 62; Ex. 1 at 7:14:20–35. Garsia said that he did not have a driver's license or any identification and that he was driving because his wife, Hernandez, was caring for the infant. T. 62; Ex. 1 at 7:14:36–52. Garsia then accompanied Trooper Biehl to the patrol car, where Trooper Biehl attempted to run a license check on Garsia. T. 63–64; Ex. 1 at 7:15:05–7:15:30. While doing so, Trooper Biehl asked where the occupants were traveling from, what they had done, where Garsia lived, and what he did for a living. T. 70; Ex. 1 at 7:15:38–7:16:18. Garsia explained that he and the occupants had been in Minnesota visiting friends and family who had purchased a new house, that they had been gone for a week, and that they were returning to Denver, where Garsia lived and owned a barbershop with five employees. T. 70; Ex. 1 at 7:15:39–7:20:35. Garsia also informed Trooper Biehl that he and his wife owned the Denali. T. 25; Ex. 1 at 7:19:57–7:20:05. A license plate check confirmed that Hernandez was the registered owner of the Denali. T. 24.

Although Trooper Biehl ran at least two checks on his computer, he was unable to find any record of Garsia having a driver's license or state identification card. T. 64–65. Trooper Biehl returned to the Denali to see whether Hernandez and Trejo had driver's licenses. T. 67; Ex. 1 at 7:21:58. When asked by Trooper Biehl about their travel itinerary, Hernandez and Trejo explained that they had been at the Mall of America and that they had stayed in a hotel while in Minnesota. Ex. 1 at 7:22:00–7:22:35.

Back in the patrol car, Trooper Biehl ran computer checks on Trejo and Hernandez and talked more with Garsia about the trip, his friends in Minnesota and their new house, and Trejo's occupation. Ex. 1 at 7:22:57–7:27:50. Garsia said that he thought Trejo worked at a painting company and that their friends' new house in Minnesota was nice. Ex. 1 at 7:22:57–7:27:50. Trooper Biehl informed Garsia that he still could not find any information on Garsia in his

2

computer search and confirmed that he was spelling Garsia's name correctly. Ex. 1 at 7:26:35–7:27:30. Trooper Biehl suspected that Garsia was lying about his identify to avoid being arrested on an outstanding warrant. T. 66–67.

Trooper Biehl went back to the Denali, returned the driver's licenses to Trejo and Hernandez, and spoke with them again. T. 71; Ex. 1 at 7:27:55–7:28:50. Trejo said that he worked at a body shop, and both he and Hernandez said that they did not know anybody in Minnesota. T. 71; Ex. 1 at 7:27:57–7:28:50.

Trooper Biehl returned to the patrol car where he questioned Garsia further. Ex. 1 at 7:29:10–7:32:00. Garsia said that he and Hernandez had visited friends at their new house while Trejo spent time with his own friends. T. 72; Ex. 1 at 7:29:10–7:30:50. Trooper Biehl could see Garsia's carotid artery pounding in his neck and believed Garsia to be excessively anxious. T. 73. Trooper Biehl informed Garsia that there were significant differences between Garsia's story and what Hernandez and Trejo were saying. Ex. 1 at 7:30:50–7:31:00. He told Garsia that he was a drug dog handler and asked Garsia whether he would find any drugs or large amounts of cash in the Denali. Ex. 1 at 7:31:00–7:32:00. Garsia denied having any drugs in the Denali but admitted that Hernandez had approximately $5,000 in her wallet that they had brought for the trip. T. 74; Ex. 1 at 7:31:00–7:32:00. The amount of cash and Garsia's travel route concerned Trooper Biehl. T. 74–75. Trooper Biehl testified at the suppression hearing that he sees large amounts of drugs transported on U.S. Highway 18, that Colorado is a "source" state for drugs, and that Minneapolis is a "destination" city for drugs. T. 75. Trooper Biehl suspected that the $5,000 were drug proceeds. T. 76.

Trooper Biehl went back to the Denali again and questioned Hernandez about the cash she had in her purse. T. 76; Ex. 1 at 7:32:45–7:34:26. Hernandez looked in her purse and said

3

that she had approximately $2,000, but Trooper Biehl could tell that the actual amount was substantially more. T. 76–77; Ex. 1 at 7:32:45–7:34:26. Hernandez also said that although Garsia used to own a barber shop, he had sold it and now worked for someone. Ex. 7:32:45–7:34:26. Trejo reaffirmed that he did not know anyone in Minnesota and that he, Garsia, and Hernandez had been at the Mall of America. T. 71; Ex. 1 at 7:33:00–7:33:22, 7:35:00–7:35:25.

Trooper Biehl returned to the patrol car and asked Garsia for consent to search the Denali. T. 77; Ex. 1 at 7:34:50–7:34:59. After Garsia refused, Trooper Biehl recounted the travelers' inconsistent stories and informed Garsia that he was going to deploy his drug dog, Zara. T. 77–78; Ex. 1 at 7:34:50–7:36:56. He stated that if Zara did not indicate to the Denali, the only remaining issue was to identify Garsia in the computer system. T. 69, 78; Ex. 1 at 7:36:20–7:36:31.

Zara alerted to the Denali's rear door by increasing her breathing and making a slight head check; she then indicated twice to the Denali's rear passenger door by sitting and staring at it. T. 78–80, 98–99; Ex. 1 at 7:36:58–7:37:44. Trooper Biehl returned Zara to the patrol car and announced that he was going to search the Denali once another officer arrived. Ex. 1 at 7:37:50–7:39:50. While waiting, Garsia gave Trooper Biehl a different spelling of his last name than he had given before. Ex.1 at 7:47:04–7:50:00. Trooper Biehl was able to find at least some information about Garsia in the computer system using the new spelling. T. 89–90; Ex.1 at 7:47:04–7:50:00.

A deputy sheriff arrived at approximately 7:55 p.m., after which Trejo, Hernandez, and the two children were transferred to the deputy's patrol car. Ex. 1 at 7:55:00–7:58:25. Trooper Biehl then searched the Denali, finding approximately $12,000 in Hernandez's purse and a duffel bag that contained a pound of methamphetamine and several documents bearing Trejo's name.

4

T. 81, 100; Ex. 1 at 7:58:20–8:04:35, 8:07:35–8:07:45, 8:14:12–8:14:22, 8:23:50–8:24:20, 8:30:28–8:30:32, 8:31:18–8:31:23, 8:34:30–8:35:00, 8:37:20–8:37:27.    Upon learning that Trooper Biehl had discovered methamphetamine in the duffel bag, Garsia stated multiple times that the bag belonged to Trejo. Ex. 1 at 8:07:20–8:08:13, 8:09:05–8:09:11; 8:14:12–8:14:40, 8:15:50–8:16:23, 8:17:40–8:17:55, 8:40:40–8:40:50. Trejo was handcuffed, placed under arrest for possession of a controlled substance, and read his rights under Miranda v. Arizona, 384 U.S. 436 (1966). Ex. 1 at 8:09:25–8:09:53.

A grand jury indicted Trejo for possession with intent to distribute a controlled substance. Doc. 14. Trejo moved to suppress the drugs and cash seized from the Denali and to produce complete records of Zara's field performance, standard training, and certifications. Docs. 30, 31. He argued that he was illegally detained to permit a canine sniff and that there was no probable cause to search the Denali because Zara was unreliable.  The government resisted Trejo's motion, arguing that Trooper Biehl had reasonable suspicion to extend the traffic stop and that Trejo, as a passenger, did not have standing[1] to challenge either the search of the Denali or the

---

[1]The Supreme Court in Rakas v. Illinois, 439 U.S. 128 (1978) abandoned reliance on traditional standing doctrines to determine whether a defendant could challenge a search. Id. at 138–140; see also United States v. Green, 275 F.3d 694, 698 n.3 (8th Cir. 2001) ("Technically, the concept of 'standing' has not had a place in Fourth Amendment jurisprudence . . . since the Supreme Court in [Rakas] indicated that matters of standing in the context of searches and seizures actually involved substantive Fourth Amendment law." (quoting United States v. Sanchez, 943 F.2d 110, 113 n.1 (1st Cir. 1991))). After Rakas, the appropriate inquiry is whether the defendant "possessed a 'legitimate expectation of privacy' in the area searched." Rawlings v. Kentucky, 448 U.S. 98, 104 (1980); see also United States v. Morales, 737 F.2d 761, 763 (8th Cir. 1984). Nevertheless, courts have continued to use the term "standing" to refer to a defendant's ability to challenge a search.  This can be misleading because unlike Article III standing, the concept of Fourth Amendment standing is not jurisdictional and can be bypassed in favor of a decision on the merits. See Steagald v. United States, 451 U.S. 204, 208–11 (1981); United States v. Ewing, 638 F.3d 1226, 1230 (9th Cir. 2011); United States v. Ned, 637 F.3d 562, 566 n.1 (5th Cir. 2011) (per curiam); United States v. Johnson, 584 F.3d 995, 999 n.3 (10th Cir. 2009); United States v. Macklin, 902 F.2d 1320, 1331 n.12 (8th Cir. 1990); Morales, 737 F.2d at 763–64; United States v. Foster, 763 F. Supp. 2d 1086, 1087–90 (D. Minn. 2011).

seizure of evidence therein. Doc. 32. The government objected to Trejo's request for Zara's field-performance and standard-training records, Doc. 32 at 12, but did provide Trejo with Zara's 2011 certification and her certifications and accompanying score sheets from 2012, 2013, and 2014. T. 6, 10–11.

The magistrate judge held an evidentiary hearing on Trejo's motion to suppress. Before offering any evidence, the government moved for a ruling that Trejo lacked standing to challenge the length of his detention and the search of the Denali. T. 13–20. Trejo objected, arguing, among other things, that he had standing—that is, a legitimate expectation of privacy—to challenge the search of the duffle bag containing the methamphetamine. T. 14–15, 19. The magistrate judge denied the government's request because he had yet to hear any evidence. T. 18–19. The government then called Trooper Biehl, elicited testimony that Hernandez and Garsia owned the Denali, and renewed its motion for a ruling on the standing issue. T. 20–25. Trejo declined to cross-examine Trooper Biehl on his testimony about ownership of the Denali but asserted that the magistrate judge should hear more evidence "regarding what was searched inside the vehicle" before ruling. T. 25–26. Relying on this Court's decision in United States v. Salgado, No. CR 12–30088-0L-02-RAL, 2013 WL 1348264 (D.S.D. Apr. 1, 2013), aff'd, 761 F.3d 861 (8th Cir. 2014), the magistrate judge ruled that Trejo had standing to challenge his detention but not the search of the Denali or the bags found therein. T. 26–28, 38, 40; see also T. 101. This prompted the government to argue that evidence of Zara's reliability was no longer necessary, T. 30–39, but the magistrate judge initially disagreed. T. 32, 41, 54

Trooper Biehl resumed the stand and testified about Zara's training and certifications as a drug dog. T. 42–52. The government introduced the certification records provided to Trejo, T. 47–48, and asked the magistrate judge to take judicial notice of its report and recommendation in

6

the Salgado case. T. 52–53. Salgado was relevant, the government argued, because it also involved a challenge to Zara's reliability. T. 7. The magistrate judge took judicial notice of its report and recommendation and this Court's decision in Salgado before announcing that it was modifying its prior ruling that the government needed to put on evidence of Zara's reliability. T. 53–54. Having had further time to review the decision in Salgado, the magistrate judge concluded that Trejo's lack of a sufficient privacy interest in the vehicle to challenge the search made evidence of Zara's reliability unnecessary. T. 53–54.

Claiming that Trejo lacked standing to challenge the search of the Denali, the government objected to several of the questions Trejo asked Trooper Biehl on cross-examination. The magistrate judge sustained the government's objection to Trejo's questions about Zara's reliability and granted the government's motion to strike "any and all prior testimony given by [Trooper Biehl] that refers or relates to the certification records and matters being offered to prove the reliability of Zara, the drug detection dog." T. 82–85. Trejo's counsel made an offer of proof on Zara's reliability, saying that the records from Zara's most recent certification raised serious questions about her ability to detect methamphetamine and arguing that Trejo was entitled to receive Zara's standard-training and field records. T. 86–89. The magistrate judge also sustained the government's objections to Trejo asking Trooper Biehl if the duffel bag with the methamphetamine was closed and whether it contained legal papers bearing Trejo's name. T. 101. Trejo argued that he had standing to challenge the search of the bag and made an offer of proof that, if allowed to question Trooper Biehl further, Trooper Biehl would testify that the duffel bag had been closed, that it contained court documents bearing Trejo's name, and that Trooper Biehl had arrested Trejo because he believed that Trejo owned the bag and had control over it. T. 101–02. The magistrate judge adhered to his ruling, explaining that the search of the

duffel bag still related to the search of the Denali, which Trejo did not have standing to challenge. T. 102

The magistrate judge issued a Report and Recommendation recommending that Trejo's motion be denied. Doc. 38. Trejo now objects, arguing that the magistrate judge made erroneous factual findings, that he has standing to challenge the search of the duffel bag, and that he should have received Zara's training and field records as well as been allowed to cross-examine Trooper Biehl about her reliability.

This Court reviews a report and recommendation pursuant to the statutory standards found in 28 U.S.C. § 636(b)(1), which provides in relevant part that "[a] judge of the [district] court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). Having conducted a de novo review, this Court overrules Trejo's factual objections but remands the case to the magistrate judge to determine whether Trejo had a legitimate expectation of privacy in the duffel bag within the Denali and to hear evidence on Zara's reliability if necessary.

## II.   Discussion

### A.   Factual Objections

Trejo objects to the factual findings underlying the magistrate judge's conclusion that Trooper Biehl had a reasonable suspicion to detain Trejo for the dog sniff. Rather than specifying which factual findings he disagrees with, Trejo argues that the video of the traffic stop demonstrates that Trooper Biehl's "suspicions" were "unfounded as a factual matter." Doc. 45 at 2. The magistrate judge concluded that the following facts, taken as a whole, provided Trooper Biehl with reasonable suspicion that Trejo, Hernandez, and Garsia were engaged in illegal drug activity: 1) Trejo, Hernandez, and Garsia were on the return leg of a round trip from Denver, a

8

"source" state for drugs, to Minneapolis, a drug "destination" city; 2) they were traveling on U.S. Highway 18, a highway that in Trooper Biehl's experience is used to transport significant quantities of drugs; 3) Hernandez was carrying a large amount of cash; 4) Garsia appeared unusually nervous and provided Trooper Biehl with an incorrect spelling of his last name; and 5) Garsia, Trejo, and Hernandez provided information that was inconsistent in many respects. Doc. 38 at 13–16. As detailed in the "Facts" section of this Opinion and Order, the testimony of Trooper Biehl and the video of the traffic stop provide ample support for the factual findings underlying the magistrate judge's conclusion that Trooper Biehl had reasonable suspicion to justify deploying Zara. Trejo's objection to the contrary is overruled.

Trejo objects also to the magistrate judge's finding that Zara alerted to the Denali's rear door and indicated twice to the Denali's rear passenger door. Trooper Biehl testified that Zara alerts to the odor of drugs by changing her breathing pattern or checking her head and that she indicates to the odor of drugs by sitting down. T. 44, 80. The video of the traffic stop shows that Zara sat down twice beside the Denali's rear passenger door, Ex. 1 at 7:37:20–7:37:34, and Trooper Biehl testified that Zara was indicating by doing so. T. 79–80, 97–99. Although it is more difficult to see on the video whether Zara alerted to the Denali's rear door, Ex. 1 at 7:37:05–7:37:25, Trooper Biehl testified that Zara alerted by increasing her breathing and making a head check. T. 78, 97. The magistrate judge, who witnessed Trooper Biehl testify, evidently found this testimony credible. Trejo's objection to the finding that Zara alerted and indicated is overruled.

## B. Standing to Challenge Search of the Duffel Bag

Trejo objects to the magistrate judge's ruling that he lacked standing to challenge the search of the duffel bag. Fourth Amendment rights are personal and may not be asserted

9

vicariously.   Rakas v. Illinois, 439 U.S. 128, 133–34 (1978).   Accordingly, a defendant challenging the constitutionality of a search under the Fourth Amendment must establish that he himself had "a legitimate expectation of privacy in the invaded place." Id. at 143.  To meet this burden, the defendant must show that he exhibited a subjective expectation of privacy in the object searched and that this expectation is objectively reasonable.  United States v. Bearden, 780 F.3d 887, 892 (8th Cir. 2015).   When a defendant testifies at a suppression hearing in an attempt to demonstrate a legitimate expectation of privacy, this testimony cannot be used as evidence of his guilt at trial.[2]  Simmons v. United States, 390 U.S. 377, 394 (1968).

Here, the magistrate judge concluded that Trejo, as a passenger in a vehicle that he did not own, lacked standing to challenge the search of the vehicle and the duffel bag found therein. T. 26–28, 38, 40, 101; Doc. 38 at 7.  In reaching this conclusion, the magistrate judge relied on this Court's decision in Salgado and the Eighth Circuit's decisions in United States v. Crippen, 627 F.3d 1056 (8th Cir. 2010), United States v. Spotted Elk, 548 F.3d 641 (8th Cir. 2008), United States v. Barragan, 379 F.3d 524 (8th Cir. 2004), and United States v. Green, 275 F.3d 694 (8th Cir. 2001).  T. 26–28; Doc. 38 at 7.  These cases, however, differ from Trejo's situation in one significant respect; unlike Trejo, the defendants in Salgado, Crippen, Spotted Elk, Barragan, and Green did not contend that they possessed a legitimate expectation of privacy in an object located in the vehicles in which they were passengers.  When a passenger in a vehicle has a legitimate expectation of privacy in a bag located therein, he may challenge a search of that bag even though he lacks standing to challenge a search of the vehicle.  Bond v. United States, 529 U.S. 334, 336–39 (2000) (holding that a bus passenger has a legitimate expectation of

---

[2]Several courts have held that such testimony may be used for impeachment purposes, however. United States v. Jaswal, 47 F.3d 539, 543–44 (2nd Cir. 1995) (per curiam); United States v. Beltran-Gutierrez, 19 F.3d 1287, 1289–91 (9th Cir. 1994); United States v. Quesada-Rosadal, 685 F.2d 1281, 1283 (11th Cir. 1982).

privacy in his luggage located within the bus); United States v. Barber, 777 F.3d 1303, 1305 (11th Cir. 2015) (concluding that passenger "had standing to challenge the search of his bag, even if he lacked standing to contest the search of the car"); United States v. Iraheta, 764 F.3d 455, 461–62 (5th Cir. 2014) (finding that passengers in the car had standing to challenge search of their luggage); United States v. Edwards, 632 F.3d 633, 641–42 (10th Cir. 2001) (holding that although defendant lacked standing to challenge the search of a rental car, he had standing to challenge the search of his luggage located in the car's trunk); United States v. Macklin, 902 F.2d 1320, 1330–31 (8th Cir. 1990) (explaining that defendant who lacked standing to challenge search of a third-party's car could still have a legitimate expectation of privacy in luggage located within the car); see also Arkansas v. Sanders, 442 U.S. 753, 761 n.8 (1979) (finding that there was "no question" of defendant's standing to challenge the search of a suitcase located in the trunk of a taxi cab where the defendant conceded that the suitcase was his), abrogated on other grounds by California v. Acevedo, 500 U.S. 565 (1991). In other words, a passenger does not lose a legitimate expectation of privacy in his or her bag simply by placing it in the vehicle of another.

The question here is whether Trejo has demonstrated that he had a legitimate expectation of privacy in the duffel bag. Several factors are relevant when determining whether a defendant had a legitimate expectation of privacy in an object, including ownership, possession or control, historical use of the object, whether the object contained the defendant's personal belongings, the ability to regulate access to the object, and all of the circumstances surrounding the search. United States v. Parada, 577 F.3d 1275, 1280 (10th Cir. 2009); United States v. Pierson, 219 F.3d 803, 806 (8th Cir. 2000). Courts have found that a passenger had a legitimate expectation of privacy in bags located in a third-party's vehicle when the passenger placed his closed bags

that contained his personal belongings in the trunk of a third-party's car, Edwards, 632 F.3d at 642, when a passenger placed his opaque bag directly above his seat on a bus, Bond, 529 U.S. at 338–39, and when the passenger was the bailee of a suitcase that the bailor had placed in the trunk of a taxi cab, United States v. Perea, 986 F.2d 633, 641–42 (2nd Cir. 1993).

Although Trejo did not testify at the suppression hearing, his counsel made an offer of proof that Trooper Biehl would testify that the duffel bag was closed, that it contained court documents bearing Trejo's name, and that Trooper Biehl arrested Trejo because he believed that Trejo owned the bag and had control over it.  T. 101–02.  The magistrate judge, apparently relying on Trooper Biehl's statements on the video of the traffic stop, found that the duffel bag contained several documents bearing Trejo's name, and the government has not objected to this finding.  The video also shows Trooper Biehl telling Garsia that the bag containing the methamphetamine was "gray and purple,"[3] Ex. 1 at 8:08:00–8:08:12, and Garsia stating multiple times that the bag belonged to Trejo.  Ex. 1 at 8:07:20–8:08:13, 8:09:05–8:09:11; 8:14:12–8:14:40, 8:15:50–8:16:23, 8:17:40–8:17:55, 8:40:40–8:40:50.

Assuming that Trooper Biehl would testify as Trejo's counsel says, this information, along with the statements on the video from Trooper Biehl and Garsia and the fact that the bag contained papers bearing Trejo's name, could be sufficient to establish that Trejo, as the owner of a closed and opaque bag within the vehicle, had a legitimate expectation of privacy in the bag. See United States v. Freire, 710 F.2d 1515, 1518–19 (11th Cir. 1983); United States v. DiGiorgio, No. 4:08CR3019, 2008 WL 2718370, at *9–10 (D. Neb. July 11, 2008). In Freire, for instance, the Eleventh Circuit rejected the argument that the defendant needed to testify at the suppression hearing to establish that he had a legitimate expectation of privacy in a briefcase

---

[3] A person would not have a reasonable expectation in a transparent bag, and a gray and purple bag presumably is not transparent.

found in a third-party's car. 710 F.2d at 1519. It held instead that testimony from a passenger in the car that the defendant owned the briefcase and gave it to the passenger for safekeeping was sufficient to demonstrate that the defendant had a legitimate expectation of privacy in the briefcase. Id. Similarly, the district court in DiGiorgio concluded that the defendant, who was a passenger in a car, had demonstrated that he had a legitimate expectation of privacy in a duffel bag located in the car's trunk where the bag contained receipts bearing the defendant's name, a police officer testified that the car's driver had told him that both the driver and the defendant had bags in the car, and the driver could be heard on a recording of the stop stating that the bag belonged to the defendant. 2008 WL 2718370, at *9–10.

The existence of a "legitimate expectation of privacy" to a piece of luggage within a vehicle necessarily involves a case-by-case determination. For example, the Third Circuit in United States v. Shabazz, 533 F. App'x 158 (3rd Cir.), cert. denied, 134 S. Ct. 832 (2013), held that a police officer's testimony that he saw the defendant leave a house with bags and place them in the trunk of a third-party's car was insufficient to establish standing where the defendant did not claim ownership in the bags at the time of the arrest and did not present any evidence at the suppression hearing that the bags or the contents therein were his. Id. at 162. Likewise, the Eighth Circuit in United States v. Payne, 119 F.3d 637 (8th Cir. 1997), held that the defendant did not have standing to contest the search of a suitcase found in the trunk of a third-party's car in which the defendant was not a passenger. Id. at 642. Although the evidence showed that the defendant had transported the suitcase to an apartment complex before returning and giving it to the third party, the Eighth Circuit found that this "temporary possession" was insufficient to establish a legitimate expectation of privacy in the bag. Id. In reaching this conclusion, the Eighth Circuit noted that the defendant had not presented any evidence that he owned the

13

suitcase, had historical use of it, had the ability regulate access to it (the suitcase was only zipped shut and had no lock), or that the suitcase had identification tags indicating that the bag belonged to the defendant. Id. Trejo's claims involving the duffel bag seem to be more analogous to the facts in Freire and DiGiorgio than those in Shabazz or Payne. But more testimony about the duffel bag and Trejo's interests in it is necessary to resolve this question.

The issue of whether Trejo had a legitimate expectation of privacy interest to contest the search of the duffel bag is remanded to the magistrate judge to hear more testimony concerning the bag and search of the bag, including the bag's appearance, contents, and location, Garsia's statements that Trejo owned the bag, and any other testimony that may be relevant to this issue.

## C. Zara's Reliability

The magistrate judge ruled that because Trejo lacked standing to contest the search of the Denali, he was not entitled to receive records of Zara's field performance and certifications or to attack the probable cause for the search based on Zara's unreliability. Doc. 38 at 8. Trejo objects to these conclusions, arguing that because he has a legitimate expectation of privacy in the duffel bag, he is entitled to 1) complete records of Zara's field performance, standard training, and certifications, and 2) cross-examine Trooper Biehl about Zara's reliability.

"The Fourth Amendment protects against unreasonable searches, that is, searches that are neither authorized by a warrant nor within one of the specific exceptions to the warrant requirement." United States v. Barraza-Maldonado, 732 F.3d 865, 867 (8th Cir. 2013). If Trejo establishes that he had a reasonable expectation of privacy in the duffel bag, the government must demonstrate that Trooper Biehl's warrantless search of the bag falls within one of the exceptions to the warrant requirement. United States v. Kennedy, 427 F.3d 1136, 1140 (8th Cir. 2005). In its brief and at the hearing, the government suggested that Zara's indication provided

14

probable cause to search the Denali. T. 33; Doc. 32 at 13. An "indication by a properly trained and reliable drug dog provides probable cause for . . . the search of a vehicle." United States v. Winters, 600 F.3d 963, 967 (8th Cir. 2010). Under the automobile exception to the warrant requirement, an officer with probable cause to search a vehicle may search any item within that vehicle that is capable of containing the object of the search, regardless of whether the item belongs to the driver, passenger, or someone else. Wyoming v. Houghton, 526 U.S. 295, 307 (1999).

Assuming that Trejo establishes a legitimate expectation of privacy in the duffel bag, he is entitled to challenge the basis for the search of the bag, including whether Zara was reliable enough to provide probable cause. See Edwards, 632 F.3d at 644–45 (considering whether there was probable cause to search rental car containing defendant's luggage where the defendant did not have standing to challenge the search of the car but did have standing to challenge the search of his luggage); Wayne R. LaFave, Search and Seizure § 11.3(c) (5th ed. 2014) ("If a person has goods on the premises of someone else under circumstances where there is an expectation of privacy in those effects, it does not follow that this person has an expectation of privacy in the *premises* of the same degree and dimensions as that of the individual in possession of the premises. When these stored goods are found and seized in a police search, certainly the bailor should be able to complain about such defects as the lack of a warrant or the lack of probable cause regarding the search which led to the seizure.").

Still, being able to challenge Zara's reliability does not guarantee Trejo access to all of Zara's records. See Florida v. Harris, 133 S. Ct. 1050 (2013). In Harris, the Supreme Court set forth the framework courts should use to assess whether a drug dog's alert to a vehicle provides probable cause to search. The relevant inquiry is "whether all the facts surrounding a dog's alert,

15

viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime. A sniff is up to snuff when it meets that test." Id. at 1058. The Supreme Court in Harris rejected the notion that the government must introduce field-performance records to establish that a dog's alert provided probable cause, id. at 1056, concluding instead that "a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert." Id. at 1057. Although acknowledging that a drug dog's performance in the field "may sometimes be relevant," id. at 1057, the Supreme Court expressed doubt about the significance of field performance records:

> Errors may abound in such records. If a dog on patrol fails to alert to a car containing drugs, the mistake usually will go undetected because the officer will not initiate a search. Field data thus may not capture a dog's false negatives. Conversely (and more relevant here), if the dog alerts to a car in which the officer finds no narcotics, the dog may not have made a mistake at all. The dog may have detected substances that were too well hidden or present in quantities too small for the officer to locate. Or the dog may have smelled the residual odor of drugs previously in the vehicle or on the driver's person. Field data thus may markedly overstate a dog's real false positives. By contrast, those inaccuracies—in either direction—do not taint records of a dog's performance in standard training and certification settings. There, the designers of an assessment know where drugs are hidden and where they are not—and so where a dog should alert and where he should not. The better measure of a dog's reliability thus comes away from the field, in controlled testing environments.

Id. at 1056–57 (footnote omitted). For these reasons the Supreme Court explained, field-performance records will have "relatively limited import" in most cases. Id. at 1056.

After the Harris decision, this Court in Salgado held that a defendant who had received Zara's certification records was not entitled to her field-performance or standard-training records. Salgado, 2013 WL 1348264, at *7–8. In denying the defendant's request for Zara's field-performance records, this Court explained that Harris established that a dog's certifications

16

and training records are the better measure of the dog's reliability. Id. at 8. Furthermore, although the Supreme Court in Harris held that a defendant must be allowed to challenge a dog's reliability—for example by cross-examining the officer, introducing fact or expert witnesses, contesting the adequacy of a certification or training program, questioning the dog's performance during the relevant stop, and cross-examining the officer about the dog's field history—the Supreme Court never suggested that a defendant must receive the dog's field-performance records. Salgado, 2013 WL 1348264, at *8. With respect to the standard-training records, this Court held that defendants are not necessarily entitled to such records under the totality-of-the-circumstances test set forth in Harris. Salgado, 2013 WL 1348264, at *8. The defendant in Salgado appealed the denial of his request for the field-performance records but not the denial of his request for the standard-training records. See Appellant's Brief, United States v. Salgado, 761 F.3d 861 (8th Cir. 2014) (No. 13-2480). The Eighth Circuit affirmed, holding that the evidence of Zara's training and certification established her reliability and that this Court did not abuse its discretion by denying the defendant's request for Zara's field-performance records. Salgado, 761 F.3d at 867.

As the record stands now, there is no evidence of Zara's reliability in this case; the magistrate judge struck the certification records and Trooper Biehl's testimony about Zara's reliability and did not allow cross-examination on these issues. T. 82–85. Should Trejo establish a legitimate expectation of privacy in the bag, he is entitled to Zara's certification records, the accompanying score sheets, and to cross-examine Trooper Biehl about any testimony he gives concerning Zara's reliability.

The government also should provide Trejo with Zara's recent standard-training records. To be sure, as this Court acknowledged in Salgado, Harris does not necessarily require the

17

government to supply the defendant with such records.  Despite not receiving Zara's standard-training records, the defendant in Salgado had a sufficient opportunity to challenge Zara's reliability when he received her certification records and was able to cross-examine Trooper Biehl.  2013 WL 1348264, at *8.  The better practice, however, is for the government, if relying on a drug dog's indication to establish probable cause, to provide defendants with the dog's recent standard-training records as well as the certification before the suppression hearing.  Like the certification procedure, a drug dog's standard training occurs in a controlled testing environment where the dog's performance can be accurately assessed; records from a dog's certification and standard training are thus the "better measure" of a dog's reliability.  Harris, 133 S. Ct. at 1057.  Indeed, evidence of "a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert."  Id.  Because a drug dog's recent standard-training records are relevant to the dog's continuing reliability to detect drugs, defendants should have access to these records.

However, the government need not provide Trejo with Zara's field-performance records at this time.  Trejo, citing United States v. Foreste, 780 F.3d 518 (2nd Cir. 2015), argues that he must receive Zara's field-performance records to cross-examine Trooper Biehl effectively.  The district court in Foreste had denied a defendant's request for a drug dog's field-performance records based on the court's view that such records were "not controlled instances" and therefore did not "tell you anything."  780 F.3d at 529.  The Second Circuit, concluding that field-performance records remain relevant after Harris, held that the district court's denial of the request for field-performance records was based on an "erroneous view of the law" and thus constituted an abuse of discretion.  Foreste, 780 F.3d at 529. Notwithstanding the Second Circuit decision in Foreste, the Salgado decision establishes that, at least within the Eighth Circuit,

18

defendants are not automatically entitled to such "minimally probative" field-performance records for the purpose of cross-examining a dog's handler. 761 F.3d at 867. Trejo has failed to adequately explain why he is entitled to field-performance records in this case, where he would be receiving more records of Zara's performance in a controlled environment than did the defendant in Salgado. If there are peculiar circumstances to justify discovery of Zara's field-performance records, the magistrate judge may order the government to produce them. However, on this record and in light of Harris and Salgado, there does not appear to be such peculiar circumstances here.

## III.   Conclusion

For the reasons stated above, it is hereby

ORDERED that this case is remanded to the magistrate judge to determine whether Trejo has a legitimate expectation of privacy in the duffel bag and to hear evidence concerning Zara's reliability if in fact Trejo has such an interest. It is further

ORDERED that the government provide Trejo with records of Zara's recent standard training and her certifications and the accompanying score sheets. It is finally

ORDERED that Trejo's other objections to the Report and Recommendation are overruled.

DATED this 15th day of July, 2015.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE

19